WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jie Zhong Duenas, | No. CV-19-00206-TUC-JGZ |
| Plaintiff, | **ORDER** |
| v. | |
| Town of Oro Valley, et al., | |
| Defendants. | |

Plaintiff Jie Zhong Duenas brings this action against Defendants Town of Oro Valley, Oro Valley Police Detective Forrest Cook, and Oro Valley Police Sergeant Andy Lopez, alleging civil rights violations arising out of Duenas's arrest for prostitution. Duenas also asserts a state law breach of contract claim, alleging the Town of Oro Valley breached a confidential agreement that resolved the criminal charge. Now pending before the Court is Defendants' Motion for Summary Judgment (Doc. 41), which is fully briefed. (Docs. 49, 50.) Having reviewed the filings, the Court will grant the Motion.[1]

**I.   Background**

The facts relating to Plaintiff Jie Zhong Duenas's arrest and settlement are undisputed.[2] Duenas owned the Trinity Spa in Oro Valley, Arizona from late 2014 through

---

[1] The Court concludes that this case suitable for decision without oral argument. *See* LRCiv. 7.2(f).

[2] Duenas's "Statement of Facts in Opposition to Motion for Summary Judgment" admits each of Defendants' statement of facts, although in some instances Duenas qualifies her admission and cites to evidence supporting her qualification. (*See* Doc. 47.) Duenas' Statement of Facts and Opposition are not in complete compliance with LRCiv 56.1. Nonetheless, the Court has reviewed and considered these filings.

2018. (Doc. 42, ¶¶ 1, 3, 51, 53; Doc. 47, ¶¶ 1, 3, 51, 53.)  After an undercover investigation of the spa, Duenas was arrested for prostitution on May 11, 2018.

**Prior complaints and investigations of illicit sexual activity at the Trinity Spa**

In 2014, a massage parlor called the Oro Spa was operated by another individual at the same location as the Trinity Spa, and arrests were made after an investigation involving undercover officers from Tucson Police Department, investigation of ads and postings on the internet indicating that prostitution was occurring at the location, and complaints from concerned citizens. (Doc. 42, ¶ 2; Doc. 47, ¶ 2.)  Duenas took over the location and operated it as the Trinity Spa at least as of November 5, 2014.  (Doc. 42, ¶ 3; Doc. 47, ¶ 3.)

On February 7, 2015, Sergeant Trevizo of the Oro Valley Police Department ("OVPD") was on patrol when he encountered Duenas's vehicle. (Doc. 42, ¶ 4; Doc. 47, ¶ 2.)  Sergeant Trevizo recalled that Duenas had been arrested in the past for giving illicit massages (Doc. 42, ¶ 4; Doc. 47, ¶ 4.)[3]  A records check confirmed Duenas's past arrest by the Marana Police Department for giving illicit massages.  (*Id*.)

In October 2015, the OVPD began receiving complaints from concerned citizens that the Trinity Spa was offering illicit sexual activities, not just massages. (Doc. 42, ¶¶ 5-7; Doc. 47, ¶¶ 5-7.) During the summer of 2016, OVPD began an investigation of the activities occurring at the Trinity Spa, including surveilling customers coming and going from the Spa, and conducting traffic stops of some of the customers after they left the Spa and asking them about the activities that occurred there. (Doc. 42, ¶¶ 8-11; Doc. 47, ¶¶ 8-11.) Most of the questioned customers denied any illegal activity occurring, though one said that the massage therapist had gotten "a little handsy." (Doc. 42, ¶ 9; Doc. 47, ¶ 9.) Another customer reported that he had received "happy endings" at the Trinity Spa in the past, and that this time he tried to put the massage therapist's hand "down there," but that instead she just "cupped below my balls" while he masturbated himself to ejaculation. (Doc. 42, ¶9; Doc. 47, ¶ 9.)  This individual stated that there was no discussion of money

---

[3] Duenas admits that this is what Sergeant Trevizo's report states, but adds that she had no previous arrests or convictions for prostitution or related offenses. (Doc. 47, ¶ 4.)

for sex, that there had been no such discussion during his prior visits, and that it was understood that the tip that he gave the massage therapist was payment for the sexual contact. (Doc. 42, ¶ 10; Doc. 47, ¶ 10). The investigation was discontinued based on lack of additional evidence. (Doc. 42, ¶ 11; Doc. 47, ¶ 11.)

Additional reports that prostitution activities were still occurring at the Trinity Spa were received in late 2016 and early 2017 from an individual who identified himself as Duenas's boyfriend. (Doc. 42, ¶¶ 12-13; Doc. 47, ¶¶ 12-13.) This individual stated he had a "gut feeling" that prostitution was occurring at the Trinity Spa based on the way that Duenas was acting and because several women were flown in from Los Angeles to work at the spa. (Doc. 42, ¶ 13; Doc. 47, ¶ 13.) He also overheard a telephone conversation between Duenas and a taxicab driver during which the driver indicated he had seen Duenas naked. (Doc. 42, ¶ 13; Doc. 47, ¶ 13.) He also believed he had contracted a sexually transmitted disease from Duenas. (Doc. 42, ¶ 13; Doc. 47, ¶ 13.)

**The investigation leading to Duenas's arrest**

OVPD began another investigation on April 4, 2018, after community members made additional complaints of suspected illegal activity occurring at the Trinity Spa. (Doc. 42, ¶ 14; Doc. 47, ¶ 14.) The investigation was supervised by Detective Cook. (Doc. 42, ¶ 15; Doc. 47, ¶ 15.) Detective Cook testified at deposition that none of the complaints involved specific information about sexual services being offered for money at the Trinity Spa. (Doc. 49, pp. 1-2 (citing Doc. 47-1, p. 4)).

During the investigation, Detective Cook spoke with the manager of the Fairfield Inn, a motel located approximately 150 yards north of the Trinity Spa. (Doc. 49, ¶ 16; Doc. 47, ¶ 16.) The manager told Detective Cook that some of the motel customers had received a "really good" massage at the Trinity Spa, saying it in such a manner that implied that more than just a massage had taken place. (Doc. 49, ¶ 16; Doc. 47, ¶ 16.) But none of the guests told the manager that they were paying money for sexual acts, nor did he have any personal knowledge that the spa was offering sex for money. (Doc. 49, p. 2 (citing Doc. 47-1, pp. 4-5).)

The manager also stated that he would see work trucks and vans pull up to the rear of the spa, and female employees of the spa would exit the rear of the business, get into the trucks or vans and drive away. (Doc. 42, ¶ 17; Doc. 47, ¶ 17.) The manager stated that he would observe female employees of the spa hanging clothes and underwear out to dry, and that customers would often enter and exit the business through the rear door. (Doc. 42, ¶ 18; Doc. 47, ¶ 18.)

Around this time, Detective Cook collected some trash from the Trinity Spa. (Doc. 49, p. 2 (citing Doc. 47-1, p. 5).) None of the trash indicated that sexual acts were occurring at the spa. (*Id*.)

Officers conducted surveillance at the Trinity Spa from April 4, 2018 to April 27, 2018. (Doc. 42, ¶ 19; Doc. 47, ¶ 19.) The officers observed that many of the Trinity Spa's customers would park in the rear or far away from the business, then enter through the unmarked rear door, even though there was ample parking near the front door of the business, which was clearly marked and open. (Doc. 42, ¶ 19; Doc. 47, ¶ 19.) On several occasions a man driving a white Dodge pickup truck was observed arriving at the spa, and Duenas would hug and kiss him, they would go to lunch, then go to Duenas's residence, where they would enter together. (Doc. 42, ¶ 20; Doc. 47, ¶ 20.) Officers also saw this individual arriving at the Trinity Spa several times, entering and leaving through the back door.[4] (Doc. 42, ¶ 21; Doc. 47, ¶ 21.) On two other occasions, after the man had been inside the spa for over an hour, he left the spa with a female employee other than Duenas. (Doc. 42, ¶ 21; Doc. 47, ¶ 21.) The two went to an ATM together. (Doc. 42, ¶ 21; Doc. 47, ¶ 21.) On multiple occasions, officers also observed the man and the same woman from the Trinity Spa hugging and kissing in public. (Doc. 42, ¶¶ 21-22; Doc. 47, ¶¶ 21-22.)

During the almost one month that the Trinity Spa was under surveillance, only three female customers entered the establishment, and one left almost immediately. (Doc. 42, ¶

---

[4] Duenas admits that officers made these observations, but adds that Detective Cook acknowledged at deposition that officers did not know whether Duenas and the man were in a relationship. (Doc. 47, ¶ 20.)

23; Doc. 47, ¶ 23.) On May 5, 2018, surveillance was conducted at another massage parlor, where it was noted that during approximately one hour and forty-five minutes, eleven females and four males entered the massage parlor while sixteen females and one male exited, and that the ages of the customers varied from twenties to sixties. (Doc. 42, ¶ 24; Doc. 47, ¶ 24.) As well as being almost entirely male, the clientele at Trinity Spa appeared unusual because it was made up predominantly of men over the age of 40. (Doc. 42, ¶ 25; Doc. 47, ¶ 25.)

During this investigation, Detective Cook conducted internet research related to potential illegal activity occurring at the Trinity Spa. He located the following information online: (1) advertisements reposted every couple of days on backpage.com for the Trinity Spa in the massage section of the website, which included a large number of sexually explicit photos and advertisements for other local women, (2) a thread related to Tucson in an online forum called USASexguide.info, a known posting area for "sex tourists" and "mongers," which included mention of the Trinity massage parlor in which a user calling himself "Hondo4923" described the sexual services available at the massage parlor as dependent on the person that conducted the massage and indicated that a massage therapist known as "Ayumi" would offer "BBBJ" (bare back blow job - oral sex with no condom), "CIM" (cum in mouth), and "FS" (full service - penetrating sex)[5], and (3) a review on spahunters.com, where user "Homer300" described a December 28, 2015 experience at the Trinity Spa in which his masseuse "got the job done." (Doc. 42, ¶ 26; Doc. 47, ¶ 26.) Detective Cook inferred that Homer300's review referred to sexual activity. (Doc. 42, ¶ 26; Doc. 47, ¶ 26.)

On April 24, 2018, Detective Cook contacted an Arizona State Massage Board investigator to inquire about the status of massage licenses for Duenas and two other female employees of the Trinity Spa. (Doc. 42, ¶ 27; Doc. 47, ¶ 27.) Cook learned that only Duenas had a valid license. (Doc. 42, ¶ 27; Doc. 47, ¶ 27.)

On April 27, 2018, Cook met with members of the Tucson Police Department

---

[5] Detective Cook did not know when the USASexguide.info thread was posted. (Doc. 47, ¶ 26.)

- 5 -

("TPD") about conducting undercover surveillance of the Trinity Spa. (Doc. 42, ¶ 28; Doc. 47, ¶ 28.) On April 27, May 1, and May 4, 2018, two undercover officers from TPD entered the spa to attempt to ascertain whether illegal sex acts were being offered for money. (Doc. 42, ¶ 29; Doc. 47, ¶ 29.) During one officer's visit, the massage therapist voluntarily stated that she did only massage, even though the officer did not inquire whether any other services, such as sex acts, were available. (Doc. 42, ¶ 31; Doc. 47, ¶ 31.) The officer's report of that encounter reflected that "no illegal sexual act had been advertised, offered, or performed. Neither was there sexual contact of any kind." (Doc. 47, ¶ 31.)

On May 1, 2018, one of the undercover officers was met at the entry of the spa by Duenas who explained the rates for a massage. (Doc. 42, ¶¶ 32-33; Doc. 47, ¶¶ 32-33.) The officer asked Duenas whether anything besides massage was offered and he made a masturbatory hand gesture. (Doc. 42, ¶ 34; Doc. 47, ¶ 34.) Duenas responded that she did not know, but that he could try. (Doc. 42, ¶ 35; Doc. 47, ¶ 35.) Duenas charged the officer for a 30-minute massage and directed him to a room. (Doc. 42, ¶ 35; Doc. 42, ¶ 35.)

When the massage therapist came into the room, the officer asked her if she would do anything else besides a massage, and he again made a masturbatory gesture. (Doc. 42, ¶ 36; Doc. 47, ¶ 36.) The woman, who did not appear to speak English very well, placed her finger over her lips as if to tell the officer to be quiet, and said, "Oh my God" and that she did not know. (Doc. 42, ¶ 36; Doc. 47, ¶ 36.) The woman further stated that she would "take care of" him during the massage. (Doc. 42, ¶ 36; Doc. 47, ¶ 36.) During the massage, the officer wore only his underwear. (Doc. 42, ¶ 38; Doc. 47, ¶ 38.) At one point, while the officer was lying on his back, the woman placed her hands on the officer's crotch over his underwear, and stated that she "did not do," and that she did not want trouble. (Doc. 42, ¶ 39; Doc. 47, ¶ 39; *see also* Doc. 42-4, p. 5.) She then made a motion with her hands as though being handcuffed. (Doc. 42, ¶ 39; Doc. 47, ¶ 39.) The woman said she would "help," but would not explain further when the officer asked her what she meant by "help," except to say that she would not touch the officer, but that he "could do it." (Doc. 42, ¶ 40; Doc. 47, ¶ 40.) The officer said that he would do it next time, and asked if any of the

other girls would do anything. (Doc. 42, ¶ 41; Doc. 47, ¶ 41.) The woman told him no, but that she would put oil on him if he chose to do it. (*Id.*) When Detective Cook was questioned at deposition about the report of this encounter, he testified that there was no direct evidence on this occasion that sexual activities were taking place for money at the Trinity Spa. (Doc. 47, ¶¶ 36-41.)

On May 4, an undercover officer returned to the spa and paid for a 30-minute massage, which he received from a different woman than the one who provided the massage on May 1. (Doc. 42, ¶¶ 42, 43; Doc. 47, ¶¶ 42, 43.) After the massage was over, the officer asked if they offered anything else and pointed to his crotch. (Doc. 42, ¶ 43; Doc. 47, ¶ 3.) The woman responded that he could do it himself. (Doc. 42, ¶ 44; Doc. 47, ¶ 44.[6]) When the officer asked whether she could do it, she said no. (Doc. 42, ¶ 44; Doc. 47, ¶ 44.) The officer then asked whether she would "do it for money and she said no." (Doc. 42-4, p. 5.) The officer asked again, and the woman responded that she would help but the officer needed to purchase more massage time. (Doc. 42, ¶ 44; Doc. 47, ¶ 44.) After the officer repeatedly asked the woman how she would help, she responded that if he wanted more time, she would give him a massage while he did it himself. (Doc. 42, ¶ 45*;* Doc. 47*,* ¶ 45.) The officer gave her a $20 tip and left. (Doc. 42, ¶ 45; Doc. 47, ¶ 45.)

On May 18, 2011, based on the information obtained during the investigation, Detective Cook applied for and obtained a search warrant for the Trinity Spa; a search was conducted that same day. (Doc. 42, ¶ 46; Doc. 47, ¶ 46.) The search warrant affidavit included the following information:

1. Customers were seen parking in the rear of the Trinity Spa or far away from the business, and entering through an unmarked, propped open door in the rear, even though there was ample parking at the front of the business;

---

[6] Duenas admits Defendants' Statement of Facts at ¶¶ 44, 45, but "add[s] that Detective Cook agreed that on this occasion there was no offer for anyone to perform a sex act for money and that nothing happened on that occasion that would constitute prostitution." (Doc. 47, ¶¶ 44, 45 (citing Doc. 47-1, p. 7).) However, the portions of Cook's testimony that Duenas cites in support, pertain to the May 1, 2018 encounter, not the May 4th encounter. (*See* Doc. 47-1, pp. 6-7.)

2. Nearly all of the customers entering the Trinity Spa were males aged forty years or older, and only three women entered the business from April 4 to April 27, 2018, and at least one of the women left immediately after entering, which was different from other massage parlors observed, where the split of male to female customers was roughly even, with many different ages represented;

3. Online research related to the Trinity Spa revealed ads on craigslist.org and backpage.com in areas that were known for prostitution activities, and forum posts on usasexguide.info listed Trinity Spa as a place that engaged in sexual activities in addition to massage services;

4. Three employees of the Trinity Spa were identified during a traffic stop: Jie Duenas, Mei Chen, and Shuzen Guerrero, and though only Jie Duenas was determined to have a valid massage license, all three women were inside the massage parlor with three or more customers for long periods of time; and

5. Undercover officers from the Tucson Police Department obtained massages from Mei Chen and Shuzen Guerrero, neither of whom was licensed to perform massage in Arizona, and Jie Duenas, the owner of the Trinity Spa, was asked whether any services other than massage were performed, making a mastu[r]batory hand gesture, to which Ms. Duenas responded, "I don't know, you can try," and that the woman who performed the massage put her hand on the officer's clothed genitals during the massage, told the officer that she did not want to get into trouble, making a gesture as though being placed in handcuffs, and then told the officer that she would help by pouring oil on him if he wanted to masturbate.

(Doc. 42, ¶ 47; Doc. 47, ¶ 47).

During the search, a naked man was discovered in one of the massage rooms. (Doc. 42, ¶ 48; Doc. 47, ¶ 48.) He denied that any improper sexual activity was occurring. (Doc. 42, ¶ 48; Doc. 47, ¶ 48). An examination of the massage rooms and linens indicated the presence of bodily excretions consistent with semen. (Doc. 42 ¶ 49; Doc. 42, ¶ 49.) A towel was tested for the specific presence of semen, and the test was positive. (Doc. 42, ¶ 49; Doc. 47, ¶ 49.) Cash totaling $9,667.18 was recovered from the Trinity Spa, none of which included any of the currency used by the TPD officers in their undercover operation.

(Doc. 42, ¶ 50; Doc. 47, ¶ 50.)

Documentation establishing that Duenas was the owner and operator of the Trinity Spa was also recovered. (Doc. 42, ¶ 51; Doc. 47, ¶ 51). As a result of the investigation, Duenas was arrested on May 11, 2018 for prostitution in violation of A.R.S. § 13-3214A. (Doc. 42, ¶ 52; Doc. 47, ¶ 52; *see also* Doc. 42-4, pp. 17-18.)

**Duenas's agreement with the Town of Oro Valley**

Duenas ultimately entered into an agreement with the Town of Oro Valley to cease operating a massage parlor in Town limits for a period of ten years, and the charges against her were dropped. (Doc. 42, ¶ 53; Doc. 47, ¶ 53). The Agreement included confidentiality and liquidated damages provisions. (Doc. 42, ¶¶ 54-55; Doc. 47, ¶¶ 54-55.)

At some unknown time, an Arizona Board of Massage Therapy ("the Board") investigator received an unsigned copy of the Agreement. (Doc. 42, ¶ 56; Doc. 47, ¶ 56.) It is unknown whether the investigator received the agreement before or after it was executed. (Doc. 42 ¶ 58; Doc. 47, ¶ 58.) Although Duenas alleges in her Complaint that the Board received a copy of the Agreement from "the Oro Valley Court" (Doc. 1, ¶ 35), Duenas asserts in her Statement of Facts that "it may be the case" that Cook informed the investigator that an agreement had been signed. (Doc. 42 ¶¶ 56, 57; Doc. 47, ¶¶ 56, 57.) Detective Cook admits that he told the investigator that the criminal charges were being dismissed and that "there was an agreement." (Doc. 47-2, p. 5.) Cook does not recall whether he shared specific details of the agreement. (*Id.*) Cook does not recall providing the investigator with a copy of the agreement. (*Id.*) Cook does not know who gave the agreement to the investigator. (*Id.*)

The Board subsequently opened an investigation of Duenas that resulted in a Consent Agreement in which Duenas agreed to a 30-day suspension of her massage therapy license. (Doc. 42, ¶ 59; Doc. 47, ¶ 59.)

**Service of notice of claim**

On October 8, 2018, the front desk of the Town of Oro Valley offices received in the mail a notice of claim submitted by Duenas's counsel on Duenas's behalf that was

addressed to the Town Manager. (Doc. 42, ¶ 63; Doc 47, ¶ 63.) The Oro Valley Town Code designates the Town Clerk as the proper party upon which to serve a notice of claim. (Doc. 42, ¶¶ 64-65; Doc. 47, ¶¶ 64-65.)

**Duenas's Complaint**

In her Complaint, Duenas alleges (1) violations of 42 U.S.C. § 1983 by all Defendants, (2) wrongful arrest in violation of the Fourth and Fourteenth Amendments, and (3) breach of contract. (Doc. 1.)

**Defendants' Motion for Summary Judgment**

Defendants move for summary judgment arguing that Duenas's constitutional law claims should be dismissed because (1) Duenas's arrest was supported by probable cause, (2) the individual officers are entitled to qualified immunity, and (3) Duenas fails present evidence sufficient to support a civil rights claim against the Town of Oro Valley. Defendants argue summary judgment is proper on Duenas's state law breach of contract claim because (1) Duenas failed to comply with Arizona's notice of claim statute, (2) the confidentiality provision and liquidated damages provisions of the contract are unenforceable against the Town of Oro Valley, and (3) Duenas lacks evidence showing that the Town or its employees disclosed the Agreement to the Arizona Board of Massage Therapy. Duenas opposes Defendants' Motion.

**II.  Summary Judgment Standard**

In deciding a motion for summary judgment, the Court views the evidence and all inferences in the light most favorable to the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285 (9th Cir. 1987). The Court accepts as true the non-moving party's evidence if it is supported by affidavits or other evidentiary material. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (citing *Celotex Corp.*, 477 U.S. at 322). The moving party merely needs to point out to the Court the absence of evidence supporting its opponent's claim; it does not need to disprove its opponent's claim. *Celotex Corp.*, 477 U.S. at 325. If a moving party has made this showing, the non-moving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. A summary judgment motion cannot be defeated "with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

### III. Discussion

#### A. The officers are entitled to summary judgment on Duenas's § 1983 claim.

Defendants Cook and Lopez seek summary judgment on Duenas's claim that her Fourth and Fourteenth Amendment rights were violated when she was falsely arrested for prostitution.[7] Defendants argue that Duenas cannot establish that the individual officer

---

[7] Count One of Duenas's Complaint alleges a claim against "All Defendants" under 42 U.S.C. § 1983 for unspecified violation of Duenas's civil rights. (Doc. 1, ¶¶ 41-42.) Count Two alleges a claim against unspecified defendants for violations of the Fourth and Fourteenth Amendments for "False Arrest-Wrongful Seizure" for prostitution. (*Id.*, ¶¶ 44-45.) As a stand-alone claim, Count One fails. "Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). To prevail under 42 U.S.C. § 1983, a plaintiff must specifically allege the constitutional right that was violated. *See Graham v. Connor*, 490 U.S. 386, 394 (1989); *Baker v. McCollan*, 443 U.S. 137, 140 (1979). Here, Count One fails to identify or even describe the constitutional right allegedly violated.
  The Court will combine the allegations of Counts One and Two together, as suggested by Defendants and not opposed by Plaintiff, and construe the allegations as asserting a 42 U.S.C. § 1983 claim for violation of Duenas's rights under the Fourth and Fourteenth Amendment. Combining the allegations would state a claim against specific defendants. The Court notes that at the Rule 16 Scheduling Conference, the Court pointed out deficiencies in the Complaint, including that Count Two did not identify specific Defendants, did not identify the date of the alleged false arrest, and did not specifically allege that the arrest was without probable cause, and Duenas's counsel confirmed that Duenas was proceeding solely on a theory that Defendants Cook and Lopez arrested Duenas without probable cause. Duenas's counsel stated that he would amend the complaint, and defense counsel agreed that amendment was appropriate at that stage in the proceeding. Although Duenas never filed an amended complaint, Defendants also did not move to dismiss the Complaint.

1    defendants violated Duenas's constitutional rights because her arrest for prostitution was
2    supported by probable cause. (Doc. 41, pp. 8-11.) Defendants alternatively argue that even
3    if probable cause did not support Duenas's arrest for prostitution, the officers had probable
4    cause to arrest her for keeping or residing in a house of prostitution. (*Id.* at pp. 11-13.)

5    Duenas disputes that the officers had probable cause to arrest her for prostitution,
6    and asserts that the officers had no direct evidence that she offered sex for money. (Doc.
7    49, pp. 7-11). Duenas further argues that because she was charged only with prostitution,
8    "any discussion of charges that she might have been charged with are not relevant to [her]
9    claims." (*Id*. at p. 7.) Duenas does not otherwise address Defendants' argument that
10   probable cause existed for her arrest for keeping or residing in a house of prostitution.

**Applicable Law on Probable Cause**

To prevail on a § 1983 claim for false arrest,[8] the plaintiff must demonstrate that there was no probable cause to arrest her. *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998). "Probable cause exists when the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense." *Hart v. Parks*, 450 F.3d 1059, 1065-66 (9th Cir. 2006) (internal quotation marks and citations omitted). "Because the probable cause standard is objective, probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest." *Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 954 (9th Cir. 2010) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153–55 (2004)). Officers need only "point to a particular statutory offense" that could have applied. *Id.* at 954 (although officers lacked

---

[8] Although Plaintiff alleges violation of her Fourth and Fourteenth Amendment rights, her claim of unlawful arrest is properly analyzed under the Fourth Amendment and there is no separate analysis under the Fourteenth Amendment. *See Fontana v. Haskin,* 262 F.3d 871, 882 (9th Cir. 2001); *see also Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 843 (1998) ("[I]f a constitutional claim is covered by a specific constitutional provision such as the Fourth . . . Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.").

- 12 -

probable cause for the stated reason for arresting plaintiff, there was no constitutional violation because probable cause existed to arrest plaintiff for a different offense). Whether a reasonable officer could have believed probable cause existed to justify a search or an arrest is "an essentially legal question" that should be determined by the court. *Actup!/Portland v. Bagley*, 988 F.2d 868, 872 (9th Cir. 1993).

**The criminal offenses at issue**

Defendants assert that probable cause existed to believe that Duenas had violated Arizona statutes prohibiting prostitution or keeping or residing in a house of prostitution.

Duenas was arrested pursuant to A.R.S. § 13-3214A, which prohibits prostitution. *See* A.R.S. § 13-3214A ("It is unlawful for a person to knowingly engage in prostitution.") "Prostitution" is defined as "engaging in or agreeing to engage in sexual conduct under a fee agreement with any person for money or other valuable consideration." A.R.S. § 13-3111(5). "Sexual conduct" is defined as "sexual contact, sexual intercourse, oral sexual contact or sadomaschochistic abuse." A.R.S. § 13-3211(8). Additionally, "sexual contact" is defined as "any direct or indirect fondling or manipulating of any part of the genitals, anus or female breast." A.R.S. § 13-3211(9); *see also State v. Mendoza*, 234 Ariz. 259, 260-61 (Ct. App. 2014) (noting that "indirect touching, fondling or manipulating of any part of the genitals" under similar definition of "sexual contact" in child molestation statute, A.R.S. § 13-1401(2), includes touching through clothing).

A.R.S. § 13-3208(B) makes it a crime to keep or reside in a house of prostitution. *See* A.R.S. § 13-3208(B) ("A person who knowingly operates or maintains a house of prostitution or prostitution enterprise is guilty of a class 5 felony."). A "house of prostitution" is "any building, structure or place that is used for the purpose of prostitution or lewdness or where acts of prostitution occur." A.R.S. § 13-3211(2). A "prostitution enterprise" is defined as "any corporation, partnership, association or other legal entity or any group of individuals associated in fact although not a legal entity engaged in providing prostitution services." A.R.S. § 13-3211(6). "Operate and maintain" is defined as "to organize, design, perpetuate or control. Operate and maintain includes providing financial

support by paying utilities, rent, maintenance costs or advertising costs, supervising activities or work schedules, and directing or furthering the aims of the enterprise." A.R.S. § 13-3211(3).

The term "lewd" is not specifically defined in Arizona statute, but has been held to have an ordinary meaning, including connoting "sexual suggestiveness." *State v. Gates*, 182 Ariz. 459, 462-63 (Ct. App. 1994) (citing Webster's New World dictionary definition of lewd: "showing, or intended to excite, lust or sexual desire, esp. in an offensive way"), *superseded by statute on other grounds as stated in State v. Chandler,* 244 Ariz. 336, 338-39 (Ct. App. 2017); *see also State v. B Bar Enters*., 133 Ariz. 99, 103 (1982) ("Although traditionally the term 'lewdness' is viewed as being broader than and including the term 'prostitution,' . . . such terms refer to the same general class of activities which are normally associated with houses of prostitution (or whatever such establishments may be called). They are intended to designate and prohibit sex acts of whatever nature which are performed for money.").

**Analysis**

Based on the undisputed evidence, the Court concludes that probable cause existed as a matter of law for officers to arrest Duenas for keeping or residing in a house of prostitution in violation of A.R.S. § 13-3208(B). In response to complaints of citizens that sexual activities were occurring in exchange for money at Trinity Spa, Officers initiated an investigation of the spa. At the time of Duenas's arrest, Officers were aware that Duenas was the owner and operator of Trinity Spa. She was the only licensed massage therapist of the three women who provided massages at the spa. The Trinity Spa had an almost exclusive clientele of men over 40, many of whom entered through the unmarked rear door of the facility for no apparent reason, and who parked their vehicles a distance from the entrance. Online research supported a reasonable belief that sexual activities in exchange for money were occurring in the spa. In addition, a customer interviewed during one investigation of Trinity Spa admitted to masturbating while being touched on the genitals by a massage therapist. That customer reported that he understood that the tip he paid to

the therapist was for sexual contact.  Moreover, an undercover officer asked Duenas about receiving more than a massage while he made a masturbatory hand gesture, and Duenas told him that he could try.  Notably, Duenas's statement shows that she was aware that sexual acts were being performed as part of the massage services occurring on the premises that she owned, operated, and managed.

In addition, Officers knew that two other massage therapists at the Trinity Spa offered to "help" an undercover officer masturbate. And the same driver of the white Dodge truck who was seen hugging and kissing Duenas, was also observed engaged in physically intimate public displays with a different Trinity Spa massage therapist. He was also seen leaving the spa with one of the massage therapists and visiting an ATM with her. Finally, during the search of the Trinity Spa, officers discovered cash totaling almost $10,000, and the presence of bodily fluids consistent with semen in all three of the massage rooms. The only linen tested for the presence of semen tested positive.

Duenas focuses on the lack of direct evidence that she offered sexual activity in exchange for money, but the lack of direct evidence as to payment is not dispositive. Probable cause for a warrantless arrest "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 243-44 n.13 (1983)); *see also United States v. Diaz*, 491 F.3d 1074, 1078–79 (9th Cir. 2007) (stating that "a probable cause determination can be supported entirely by circumstantial evidence" and "[p]eople draw 'reasonable' conclusions all the time without direct evidence. Indeed, juries frequently convict defendants of crimes on circumstantial evidence alone."). *State v. Rowan*, 176 Ariz. 114, 114 (1992), is instructive.  In *Rowan*, the Arizona supreme court agreed with the trial court's denial of a request for directed verdict on the charge of keeping a house of prostitution based on evidence that the defendant answered a call to the beeper service, discussed the price of a full body massage with an undercover officer, drove the masseuse to the agreed-upon motel for the massage, and was apprehended with a beeper that answered to the beeper service's telephone number.  176 Ariz. at 114. The trial court

had concluded that this evidence, along with the evidence that the masseuse committed an act of prostitution at the hotel, by touching the undercover officer's genitals during a massage, was sufficient to permit the jury to infer that the defendant and the masseuse acted as a "group of individuals associated in fact" for the purpose of providing prostitution services. *State v. Rowan*, 174 Ariz. 285, 286-87 (Ct. App. 1992), *affirmed in part and vacated in part*, 176 Ariz. at 116 (vacating only the portion of the court of appeals opinion pertaining to admission of defendant's prior conviction).

Based on the undisputed evidence presented here, the Court similarly finds that it was objectively reasonable for the Officers to conclude that there was a probability or substantial chance that prostitution or sexual acts for money were occurring at the Trinity Spa, and that Duenas was involved in those activities, even if her involvement was limited to her ownership, management, operation and maintenance of a house of prostitution in violation of A.R.S. § 13-3208(B). Accordingly, Defendants Cook and Lopez are entitled to summary judgment on Duenas's § 1983 claim.

### B. The Town of Oro Valley is entitled to summary judgment on Duenas's § 1983 claim

Defendants seek summary judgment on Duenas's § 1983 claim against the Town of Oro Valley, arguing that Duenas offers no evidence that would establish liability on the part of the Town for violation of Duenas's constitutional rights. (Doc. 41, pp. 14-15.)

A municipality or other local government unit may not be sued under § 1983 solely because an injury was inflicted by one of its employees or agents. *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). Rather, the municipality is liable only when the execution of its policy or custom inflicts the constitutional injury. *Id.* (citing *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 690–94 (1978)). Thus to succeed on her claim against the Town, Duenas must prove that her constitutional rights were violated and the Town of Oro Valley had a policy or custom that led to this deprivation. *Monell*, 436 U.S. at 694; *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). A widespread practice that, although not authorized by written law or express municipal

policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law satisfies the *Monell* test. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Proof of random acts or isolated incidents are insufficient to establish a custom. *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1996).

The Court concludes that Duenas's inability to show that officers violated her constitutional rights dooms her claim against Oro Valley. As discussed in section III.A., Duenas's arrest was supported by probable cause. Where the plaintiff has suffered no constitutional injury at the hands of the individual officers, a *Monell* claim fails. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("[N]either *Monell* . . . , nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when . . . the officer inflicted no constitutional harm."); *Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007) ("If no constitutional violation occurred, the municipality cannot be held liable.").

Duenas argues that "this case is not about the Town being vicariously liable" for actions of the police officers. (Doc. 49, p. 15.) She contends the Town is liable because the Town "participated in a common operation that resulted in a breach of contract that was expressly entered into by the parties and thereby allowed acts to be set in motion that they know or should have known would lead to breach of Plaintiff's rights under that agreement." (*Id.*) Duenas's argument is not related to the § 1983 claim alleged in her Complaint that "[a]ll Defendants" violated her constitutional rights based on false arrest. Duenas presents no support from which the Court could conclude that her claim that the Town breached the settlement agreement is anything more than a state law contract claim. In fact, Duenas's Complaint specifically alleges the Town's breach of contract as a "State Law Claim." (Doc. 1, p. 7.) [9] Therefore, the Court will grant summary judgment in favor

---

[9] Duenas notes that "[a] number of federal courts have stated that an additional *Monell* trial 'has little, probably no, practical significance since the City indemnifies its employees for damage awards made against them in respect of the torts they commit in the course of their employment, plaintiff will collect his judgment in full whether or not the City is held liable.'" (Doc. 49, p. 15 (quoting *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1984).) The cases Deunas cites acknowledged that a determination of *Monell* liability was essentially superfluous where juries found the plaintiffs had been deprived of their constitutional rights by the individual officers, all compensable damages resulting

- 17 -

of Defendant Oro Valley on the § 1983 claim.

### C. Duenas's state law claim is barred by A.R.S. § 12-821.01

Before suing a public entity or a public employee, a claimant must file a notice of claim in compliance with Arizona's notice of claim statute, which provides:

> Persons who have claims against a public entity, public school or a public employee shall file claims with the person or persons authorized to accept service for the public entity, public school or public employee as set forth in the Arizona rules of civil procedure within one hundred eighty days after the cause of action accrues. The claim shall contain facts sufficient to permit the public entity, public school or public employee to understand the basis on which liability is claimed. The claim shall also contain a specific amount for which the claim can be settled and the facts supporting that amount. Any claim that is not filed within one hundred eighty days after the cause of action accrues is barred and no action may be maintained thereon.

A.R.S. § 12-821.01(A). "'When a person asserts claims against a public entity and public employee, the person must give notice of the claim to *both* the employee individually and to his employer.'" *Harris v. Cochise Health Sys.*, 215 Ariz. 344, 351 (Ct. App. 2007) (emphasis in original); *see also Rodriguez-Wakelin v. Barry*, No. CV-17-00376-TUC-RM, 2018 WL 3619978, at *4 (D. Ariz. July 30, 2018) (same), *vacated in part on reconsideration*, No. CV-17-00376-TUC-RM, 2018 WL 5255184 (D. Ariz. Oct. 22, 2018). "Providing notice to a governmental agency fails to suffice to give notice to the individual employee." *McGrath v. Scott*, 250 F.Supp.2d 1218, 1236 (D. Ariz. 2003); *see also West v. United States*, No. CV–14–00254–PHX–DGC, 2015 WL 427715, at *3 (D. Ariz. Feb. 2, 2015) (claim against city employee barred where plaintiff served notice of claim on city but not on individual employee).

The filing of a notice of claim pursuant to A.R.S. § 12-821.01(A) may be accomplished by mailing the notice to a person authorized to accept service. *See Lee v. State*, 218 Ariz. 235, 239 (2008). "Strict compliance with A.R.S. § 12-821.01(A) is

---

from the constitutional violation to the plaintiffs had been assessed, thus no other damages were sought against the city, and it was undisputed that the city would pay the judgment. *See Jones*, 856 F.2d at 995; *Sanchez v. City of Riverside*, 596 F.Supp. 193, 195 (C.D. Cal. 1984). The cited cases do not support a determination that Duenas has presented evidence sufficient to support a *Monell* claim.

required." *Rodriguez-Wakelin*, 2018 WL 3619978, at *4 (citing *Simon v. Maricopa Med. Ctr.*, 225 Ariz. 55 (Ct. App. 2010)). "Neither '[a]ctual notice' nor 'substantial compliance' is sufficient." *Id.* (quoting *Falcon ex rel. Sandoval v. Maricopa Cnty.*, 213 Ariz. 525, 527 (2006)). "'If a notice of claim is not properly filed within the statutory time limit, a plaintiff's claim is barred by statute.'" *Id.* (quoting *Falcon*, 213 Ariz. at 527).

Duenas failed to properly serve her notice of claim on the Town of Oro Valley. Rule 4.1(h) of the Arizona Rules of Civil Procedure provides that service on a municipal corporation is accomplished by serving the clerk of that municipal corporation.[10] Duenas does not dispute that she addressed her notice of claim to the Town Manager of the Town of Oro Valley, not the Town Clerk as required by A.R.S. § 12-821.01. (Doc. 42, ¶ 63, Doc. 47, ¶ 63.) Although Duenas asserts that Arizona's notice of claim statute is subject to waiver, estoppel, and equitable tolling (Doc. 49, pp. 16-17), Duenas provides no basis upon which any of those circumstances would apply here. Because Duenas's service of her notice of claim did not comply with Arizona's notice of claim statute, her claim against the Oro Valley is barred.[11]

**IV. Conclusion**

Duenas fails to establish that Defendants violated her constitutional rights in violation of 42 U.S.C. § 1942. Duenas's breach of contract claim is barred for failure to comply with Arizona's notice of claim statute. Having found these bases for summary

---

[10] The Oro Valley Town Code also designates the Town Clerk as the proper party upon which to serve a notice of a claim in accordance with A.R.S. § 12-821.01. (Doc. 42, ¶¶ 65, 66; Doc. 47, ¶¶ 65, 66.)

[11] Duenas does not allege a breach of contract claim against Defendants Cook and Lopez in her Complaint. The Complaint alleges only that "Defendant Oro Valley breached th[e] contract when it released information to the Arizona Board of Massage Therapy." (Doc. 1, ¶ 49.) Nonetheless, in the pending motion and response, the parties dispute whether Defendants Cook and Lopez were properly served with a notice of claim. They were not.
Duenas asserts that she complied with Arizona's rule for service on individuals by serving the officers "in their place of work on a person who was authorized to receive service of process on behalf of police officers." (Doc. 49, p. 17 (citing Ariz. R. Civ. P. 4.1(d)(3).) Plaintiff fails to demonstrate that Cook or Lopez authorized the Town Manager to receive service on their behalf. *See* Ariz. R. Civ. P. 4.1(d)(3). In addition, Duenas was also required to serve the individual defendants' employer. *See Rodriguez-Wakelin*, 2018 WL 3619978, * 4. Duenas fails to produce proof that she did so. Therefore, any claim against Cook or Lopez for breach of contract would also be barred by A.R.S. § 12-821.01.

judgment dispositive of the claims asserted in this case, the Court will not address Defendants' alternative arguments.

For the foregoing reasons,

IT IS ORDERED that Defendants' Motion for Summary Judgment (Doc. 41) is GRANTED.

The Clerk of Court is directed to enter judgment accordingly and close the file in this action.

Dated this 27th day of January, 2021.

_____
Honorable Jennifer G. Zipps
United States District Judge